# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 11-2430

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | Appeal from the United States |
| | * | District Court for the |
| v. | * | Eastern District of Arkansas. |
| | * | |
| Justin Daniel Deatherage, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: February 13, 2012
Filed: June 26, 2012

_____

Before LOKEN, BOWMAN, and BYE, Circuit Judges.

_____

LOKEN, Circuit Judge.

Justin Deatherage was charged with four counts of receiving and one count of possessing child pornography downloaded to his computer from July 14 to July 17, 2008. After pretrial release and numerous continuances, in November 2010 he pleaded guilty to the possession count, a violation of 18 U.S.C. § 2252(a)(4)(B). After a two-day contested hearing, the district court[1] sentenced Deatherage to seventy months in prison and ten years of supervised release. He appeals four special conditions of supervised release. When a defendant properly objects at sentencing,

_____

[1]The Honorable Susan Webber Wright, United States District Judge for the Eastern District of Arkansas.

we review special conditions for abuse of discretion. United States v. Stults, 575 F.3d 834, 850 (8th Cir. 2009), cert. denied, 130 S. Ct. 1309 (2010). Because the issues raised on appeal turn primarily on the district court's credibility findings, which are virtually unassailable, we affirm.

## I.

Our court has published more than twenty opinions reviewing challenges to special conditions of supervised release imposed in sentencing a variety of sex offenders. These issues recur in sex offender cases[2] because a number of special conditions commonly imposed, including those recommended by the Sentencing Commission in § 5D1.3(d)(7) of the Guidelines, may result in "sweeping restrictions on important constitutional rights," such as conditions severely restricting a defendant's right to contact children, including his own; to view sexually-oriented materials protected by the First Amendment; or to access and use computers and the Internet. United States v. Crume, 422 F.3d 728, 733 (8th Cir. 2005). Our standards of review are now well-established:

> A district court has broad discretion to impose special conditions of supervised release, so long as each condition complies with the requirements set forth in 18 U.S.C. § 3583(d). Section 3583(d) first requires that a special condition must be reasonably related to the nature and circumstances of the offense of conviction, the defendant's history and characteristics, the deterrence of criminal conduct, the protection of the public from further crimes of the defendant, and the defendant's educational, vocational, medical, or other correctional needs. . . . Second, a special condition also must involve no greater deprivation of liberty than is reasonably necessary to deter criminal conduct, to protect the public from further crimes of the defendant, and to provide for the

---

[2]See generally U.S. Sentencing Comm'n, Federal Offenders Sentenced to Supervised Release pp. 20-27 (July 2010).

defendant's educational, vocational, medical, and other correctional needs. Finally, a special condition must be consistent with any pertinent policy statements issued by the Sentencing Commission. In fashioning a special condition of supervised release, a court must make an individualized inquiry into the facts and circumstances underlying a case and make sufficient findings on the record so as to ensure that the special condition satisfies the statutory requirements.

\* \* \* \* \*

Our cases say that a court may impose a special condition on the ground that it is related to a defendant's prior offense, but that a court may not impose a special condition on all those found guilty of a particular offense.

\* \* \* \* \*

At some point, there must be a limit to the need for an individualized inquiry, because certain characteristics may justify corresponding conditions for virtually all offenders with such characteristics . . . .

United States v. Springston, 650 F.3d 1153, 1155-56 (8th Cir. 2011), vacated and remanded on other grounds, 132 S. Ct. 1905 (2012), quoted extensively in United States v. Schaefer, 675 F.3d 1122, 1124 (8th Cir. 2012). Of critical importance in this case, even in the absence of individualized findings a special condition need not be vacated "if the basis for the imposed condition can be discerned from the record." United States v. Thompson, 653 F.3d 688, 694 (8th Cir. 2011); accord United States v. Smith, 655 F.3d 839, 845 (8th Cir. 2011).

## II.

The underlying investigation began in June 2008 when Michele Alford, a young single mother, contacted the Russellville, Arkansas police. Alford reported

-3-

that she was in a longstanding sexual relationship with Deatherage, a thirty-year-old married father of two young children, and had become concerned that Deatherage's graphic descriptions of abusive sexual contact with his children's twelve-year-old babysitter, a ten-year-old friend of the babysitter, and a seven-year-old girl who lived across the street from Deatherage were not simply fantasizing, as Alford initially assumed. The police advised they would need more evidence of child sex abuse. Alford provided an undated printout of an online chat with Deatherage in which he discussed in lurid detail this illegal sexual contact. At police request, Alford asked Deatherage if he had pictures of this contact and then met him on the morning of July 18 wearing a hidden "wire" to record their conversation. Deatherage was arrested when he again detailed sexual encounters with the children in graphic detail.

In a post-arrest interview, Deatherage denied having sexual contact with the children or being sexually attracted to children, claiming that he only described sexual fantasies with young girls to arouse Alford. Continuing to investigate, the police did not identify the babysitter or her friend. The seven-year-old neighbor was interviewed by an Arkansas State Police investigator. She denied sexual contact with Deatherage but "had a very strong reaction when asked about anybody touching her inappropriately," and her demeanor when Deatherage was mentioned "was not consistent with a friendly, healthy relationship."

Meanwhile, Deatherage's wife consented to seizure of the family computer. A warrant search uncovered six videos and some twenty images of child pornography downloaded between July 14 and 17 that included images of prepubescent females under age twelve being subjected to bondage and engaging in bestiality. Most of the videos pictured the same young girl whose mother later submitted a victim impact statement. Police also found a thirty-page listing of more than one hundred links to pedophile websites. This federal prosecution followed.

## III.

We view these sentencing issues from the perspective of the sentencing judge. For Judge Wright, the fact-finding began when Deatherage appeared for the change-of-plea hearing. Defense counsel sought to continue the hearing upon learning that Deatherage must show "exceptional circumstances" to avoid immediate detention after pleading guilty to a child pornography offense. Noting the long delay, Judge Wright responded that Deatherage must change his plea or be promptly tried. The government urged immediate detention even if Deatherage did not enter a guilty plea. The court ordered an immediate hearing on that issue. FBI case agent Todd Hudson testified that Deatherage's former sister-in-law (his wife having divorced him soon after his arrest) had called earlier that week from Pennsylvania, where the ex-wife and children were living. She reported seeing inappropriate sexual contact between Deatherage and his young children and overhearing the State Police investigator's interview of the son, which resulted in the children's immediate placement in foster care. She further opined that "both children are in counseling due to the outward manifestations of sexual abuse." After hearing testimony by Deatherage, the court found based on the new allegations and the online chat with Alford that he "is a danger to the community" and ordered him detained. The court observed, "I am very concerned after reading this chat. If it's a fantasy, he doesn't write it as if it's a fantasy." Deatherage then entered the guilty plea.

The primary issue at sentencing was the prison term to be imposed. Consistent with non-binding stipulations in the plea agreement, the Presentence Investigation Report recommended a base offense level of 18, four enhancements totaling 12 levels under U.S.S.G. § 2G2.2(b), and a 2-level reduction for acceptance of responsibility. Before the start of the two-day evidentiary hearing, neither party objected to the PSR recommendations, resulting in an advisory guidelines range of 70 to 87 months in prison and supervised release that could be imposed for the defendant's lifetime. As both sides would present evidence, the court directed the government to proceed first.

The government's first witness was FBI agent Hudson who described the state and federal investigation, laid foundation for copies of the online chat and the wire recording admitted as Exhibits 1 and 3, described the forensic examination of Deatherage's computer, and recounted again the report from the state investigator who interviewed the seven-year-old neighbor. The six downloaded videos were admitted as Exhibit 4 and played in open court. The additional images of child pornography found in the computer's temporary internet file folder were admitted as Exhibit 5, and the thirty-page list of pedophile websites previously admitted at the detention hearing was admitted as Exhibit 2. On cross examination, Hudson admitted that he had no personal knowledge of Deatherage molesting or being charged with molesting any child, no other images of child pornography were found on his computer, and typically in Hudson's experience offenders are found with large volumes of child pornography in their possession.

The government's second witness was Michele Alford. She candidly described her extended sexual relationship with Deatherage, including three-way sexual intercourse with Deatherage and his wife on one occasion. At some point, she testified, Deatherage began talking about his "flirty" twelve-year-old babysitter, talk that progressed to increasingly graphic descriptions of sexual contact with the babysitter, her ten-year-old friend, and a seven-year-old female neighbor. Though Alford initially did not believe these accounts of sexual contact with young girls, she eventually became concerned and reported these talks to the Russellville police. They were concerned but needed proof. Alford then produced the online chat with Deatherage that became Exhibit 1. She also asked him "to bring photos to prove that he wasn't lying to me about what was going on," and agreed to wear a wire to record the conversation on July 18 that became Exhibit 3. Alford denied asking Deatherage to download child pornography and denied any intent to view child pornography with him. On cross examination, Alford admitted knowing Deatherage was married with two children when their affair began. She also admitted being sexually involved with other married men, posting nude pictures of herself on the internet, and being

involved in "swinging" sexual parties in the Fayetteville area. She denied ever acting like she was turned on by Deatherage's stories of having sex with a child, or ever asking him to leave his wife, or being mad at him when she went to the police. She asked him for pictures because he told her he was taking pictures of his sexual contacts with the babysitter and the police had asked for proof.

The first defense witness was a licensed sex-offender treatment therapist who had administered several tests and opined that Deatherage presented a "low or low moderate risk" of reoffending. The therapist had not read the online chat, listened to the wire recording, or viewed the images retrieved from Deatherage's computer. More significantly, his opinion was based on Deatherage's denials, which the district court found not credible, so his opinion was given little if any weight.[3]

Deatherage testified in his own defense when the hearing resumed one week later. He blamed his wife for visiting the "AdultFriend Finder" website to find a partner for three-way sex, which led to a relationship with Alford that continued long after his wife lost interest. He asserted that his descriptions of sexual encounters with underage girls were prompted by fantasies Alford brought up during the last month or two of their relationship; that none of the activity he described in fact occurred; and that his fantasy descriptions of abusing young girls were intended to, and did in fact, appeal to her sexual appetites, which in turn aroused him. He admitted visiting the pedophile websites listed on Exhibit 2 and downloading the six videos and other images of child pornography but claimed he only did so at Alford's insistence and after she threatened to reveal their affair to his wife. He denied being "turned on by sex with children," or having an "inappropriate relationship" with his children or anyone else's. On cross exam, Deatherage testified that he intended to give the

_____

[3]The district court asked this witness: "Would your result be different if you had made the assumption that he had had some contact with children?" The expert answered, "Obviously, yes."

downloaded videos and images to Alford but never did; that he used Limewire as the search engine to find the videos but had never looked at child pornography before July 14; and that he "previewed" the downloaded videos but never watched them in full length. He could not explain why the same young girl was in most of the videos.

Recalled as a rebuttal witness, Agent Hudson testified that the government had re-examined Deatherage's computer between the two hearing days and determined that the operating system was installed on June 26, 2008. It was his understanding that a new operating system may write over prior files on a hard drive, making it impossible for even a forensic examiner to retrieve them.

## IV.

At the conclusion of the evidentiary hearing, defense counsel argued that, although the "facts are very sordid," Deatherage is not a typical child pornography offender because he only downloaded the pornographic materials in one four-day period for Alford's gratification. Thus, he is not likely to reoffend, the child pornography guidelines should not apply, and "probation is an appropriate sentence" because he has suffered enough from his poor moral judgment. The government agreed that the guidelines are not appropriate: with the lies put forth in Deatherage's unbelievable testimony, "the guidelines are too low." Based on the wire recording and online chat, the videos, and Deatherage's effort to "pull one over on the Court," the government urged a statutory maximum sentence of ten years or at least the high end of the advisory range.

Prior to imposing sentence, the district court reviewed the evidence in some detail. The court noted that the narrow four-day window in which Deatherage downloaded child pornography was evidence in favor of his claim the "he is outside the range of the typical defendant." However, the court concluded that this factor was outweighed by its resolution of the critical credibility issue:

It's a lot of images of child porn, and the Court unfortunately had to view this. As I recall, several of the videos are . . . of the same little girl . . . .

Anyone who would download these things must have some pretty sick reason for it and, of course, it is against the law. Other evidence against Mr. Deatherage is the chat [and the wire recording]. Both on the chat and on the wire Mr. Deatherage describes sexual acts with children in graphic detail. And I thought at his plea hearing that that detail was so extensive that, if he didn't do these things, he really had a heck of an imagination, and I still think that.

I still think that the government has established more likely than not that these are real things that happened . . . .

The court also rejected, based on its finding as to her credibility, Deatherage's claim that the recorded talks were the product of Alford's vengeful motive to entrap him. The court then concluded:

[T]his whole case is extremely sordid, and it is very difficult for me. But I . . . am not convinced that Mr. Deatherage was just making up everything in that chat or . . . on that wire. And the fact that he downloaded these things, which are totally disgusting, and never showed them to Michele would indicate to me that he was doing this for his own gratification.

And I, therefore, find that a guideline sentence is fair [after] considering all the factors in 18 [U.S.C.] § 3553(a).

The court imposed a sentence of 70 months in prison, the bottom of the advisory range, followed by ten years of supervised release. In addition, the court imposed ten special conditions of supervised release. Defense counsel responded:

We object to the no . . . adult pornography prohibition. We also object to the unsupervised contact with anyone under 18 without

-9-

permission from the probation because he still has young children that he should be permitted to see. We object to no computer ownership or internet access without permission from the probation because . . . in this day and age, and particularly in order to get a job, he is going to need a computer. . . . [H]e should have the right to have internet access and to adult pornography without involving probation.

THE COURT: I am going to leave those conditions there. We frequently see in child pornography cases that people also have adult pornography, and so we would just like to keep these sex offenders away from pornography. I know that your position and Mr. Deatherage's position is he is not a danger to minors. I have found otherwise. . . . [H]e more likely than not is attracted to minors and has had some contact with minors and . . . so those are my reasons. . . . [W]ith respect to computers . . . he got the pornography from a computer. . . . [E]ven for those who have been convicted of doing that, there are devices to put on the computer, as I mentioned while I was imposing these conditions, and with the aid of probation . . . even those people are allowed to use a computer as long as they have this device.

## V.

We set forth, with some abbreviating, the four special conditions that Deatherage challenges on appeal:

4. The defendant shall not purchase, possess . . . or use any media forms containing pornographic images or sexually oriented materials including . . . . materials containing "sexually explicit conduct" as defined in 18 U.S.C. § 2256(2).

5. The defendant shall not own or use any computer or device . . . without first receiving written permission from the probation officer. . . . The defendant shall agree to the installation of computer monitoring software and hardware approved by the probation office . . . .

-10-

2. Defendant shall participate in sexual offender treatment under the guidance and supervision of the Probation Officer and abide by the rules, requirements and conditions of the treatment program . . . . [T]he defendant shall abstain from the use of alcohol throughout the course of treatment and submit to testing.

8. The defendant shall disclose business and personal financial information upon request of the U.S. Probation Office.

We have two overriding problems with Deatherage's contentions on appeal. First, a primary focus is the alleged inadequacy of the district court's explanations in response to defense counsel's objections at the conclusion of the sentencing hearing, for example, repeated assertions that an explanation did not reflect the individualized findings our cases require. But that objection was not made to the district court. A general objection at sentencing to the substantive restriction imposed by a special condition is not enough to preserve an allegation that the court did not adequately explain its specific reasons for imposing the special condition. See Stults, 575 F.3d at 854; United States v. Simons, 614 F.3d 475, 478-79 (8th Cir. 2010). Therefore, we review the court's explanations for plain error, a "formidable" standard of review that is not met if "the reasons for the imposition . . . are discernable from the record." United States v. Poitra, 648 F.3d 884, 889-90 (8th Cir. 2011); see generally United States v. Olano, 507 U.S. 725, 732 (1993).[4]

---

[4]In the opinion of the author and Judge Bowman, because special conditions of supervised release can be anticipated in every sex offender sentencing, and our standards for imposing them are now well-established, we should stop doing plain error review *of this procedural issue*. Liberal plain error review in which we parse the district court's explanation and then scrounge the record to find support for a perceived deficiency invites defense counsel not to object, since an objection gives the district court an opportunity to correct any deficiency. In our view, if counsel does not timely object that the reasons for imposing a condition have not been adequately explained, defendant has voluntarily relinquished the issue, and we should deem it waived, not merely forfeited. Cf. United States v. Harrison, 393 F.3d 805, 806 (8th Cir. 2005).

Second, Deatherage's arguments on appeal reflect the major premise he *unsuccessfully* urged at sentencing -- that he is simply a one-time offender who downloaded child pornography over a four-day period and was not shown to be "obsessed with or addicted to child or adult pornography." The sentencing record is to the contrary. Once the district court made adverse credibility findings, its most difficult task was to fashion a sentence that is "sufficient but not greater than necessary." 18 U.S.C. § 3553(a). Given Deatherage's false denials, likely abuse of three young girls and his own children, and possession of a large quantity of vile child pornography, imposing a maximum prison term (ten years) and a lifetime of supervised release warranted some consideration. The court instead imposed a prison term of 70 months -- without doubt a substantial punishment but considerably less than sentences that have been imposed on other dangerous child sex offenders -- and only ten years of supervised release. In these circumstances, stringent special conditions were necessary "to reflect the seriousness of the offense" *and* to "protect the public" -- young children -- "from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(A), (C). On this extensive evidentiary record that includes the court's careful findings of fact, little additional explanation was needed to make the need for carefully tailored special conditions "discernable from the record."

A. Turning to the specific conditions at issue, Deatherage first argues that Special Condition 4 was an abuse of the court's discretion because it includes a ban on adult pornography not supported by individualized findings and imposing a greater deprivation of liberty than necessary. We carefully review broad bans on possessing sexually explicit materials because they implicate important First Amendment rights. See, e.g., United States v. Kelly, 625 F.3d 516, 520-22 (8th Cir. 2010). Thus, in United States v. Bender, 566 F.3d 748, 752 (8th Cir. 2009), we vacated a broad ban on adult pornography explained only by the district court's opinion that "a sex offender doesn't have any business looking at *Playboy* magazine." But we have upheld conditions that were obviously relevant to the child pornography offense at

-12-

issue or to the defendant's history and characteristics. See United States v. Anderson, 664 F.3d 758, 768-69 (8th Cir. 2012); United States v. Wiedower, 634 F.3d 490, 496-97 (8th Cir. 2011); Thompson, 653 F.3d at 693-96; United States v. Boston, 494 F.3d 660, 667-68 (8th Cir. 2007); United States v. Ristine, 335 F.3d 692, 694 (8th Cir. 2003). Here, given the obvious relationship between the child pornography offense, Deatherage's likely abuse of young children, and his sordid affair with Alford, the district court did not abuse its discretion by banning possession of all sexually oriented materials during his ten years of supervised release.

B. Deatherage next argues that Special Condition 5 is an unreasonable restriction on his important rights to use computer devices and to access the internet because he only used his computer to receive and possess child pornography, like the defendants in Wiedower, 634 F.3d at 497, and in Crume, 422 F.3d at 733. It is true that Deatherage did not use computers to produce or distribute child pornography, but computer use and internet access were central to his child pornography offense as well as his sexual relationship with Alford. The district court learned at the earlier detention hearing that Deatherage had violated a condition of pretrial release that he have no internet access by accessing his "MySpace" page (according to defense counsel, because a friend accessed Deatherage's MySpace account, again blaming a violation on someone else). Deatherage argues that, under this condition, he "simply will not be able to function in society while on supervision." But this contention ignores the court's explanation that the "ban" will be limited, if he so desires, to installing approved computer monitoring devices and consenting to unannounced examination of his computers and storage devices. We have repeatedly upheld limited conditions on computer usage and internet access that were related to the offense or to the defendant's history. See United States v. Morais, 670 F.3d 889, 895-97 (8th Cir. 2012); United States v. Mayo, 642 F.3d 628, 632-33 (8th Cir. 2011); Stults, 575 F.3d at 850, 855-56; Bender, 566 F.3d at 750-52; Boston, 494 F.3d at 668; Ristine, 335 F.3d at 696. Condition 5 was not an abuse of the court's discretion.

C. Deatherage next argues the district court committed plain error in imposing Special Condition 2 because it "bans alcohol consumption and orders mandatory testing of alcohol use throughout the course of sex offender treatment." In support, he relies on our many cases questioning the efficacy of alcohol bans and reversing broad prohibitions unrelated to the offense or the offender at issue. See Simons, 614 F.3d at 480 (collecting cases). This argument -- not made to the district court -- ignores the context of the special condition, that Deatherage abstain from the use of alcohol only during the course of sex offender treatment.

Deatherage's array of sexual misconduct, and persistent efforts to deny and cover up that misconduct, clearly warranted mandatory sex offender treatment. Indeed, before addressing the terms of supervised release, the district court recommended to the Bureau of Prisons "that while he is incarcerated, he participate in mental health treatment, intensive sex offender treatment, and in educational and vocational programs." Deatherage does not challenge the primary purpose of Special Condition 2, the likely need for post-incarceration treatment. He complains only that the alcohol restriction is unreasonable because he has no history of alcohol or drug abuse. Of course, if he is not a drinker, the restriction will have no adverse impact on him. More importantly, the defendant has the burden to establish that a special condition is unreasonable. Here, the record is devoid of evidence that alcohol consumption does not adversely affect a course of sex offender treatment. Common sense suggests that treatment experts would strongly argue that it does. The district court committed no plain error in imposing Special Condition 2.

D. Finally, Deatherage argues the district court committed plain error in imposing Special Condition 8 because requiring him to disclose financial information to the probation office upon request was unrelated to the offense of conviction. The district court's explanation when it imposed this condition -- "because sometimes sex offenders spend money on the internet or elsewhere to purchase pornographic materials" -- suggests, as Deatherage argues on appeal, that it was improperly

imposed because of Deatherage's membership in the universe of sex offenders, rather than an individualized inquiry. On the other hand, the record reflects that Deatherage was in arrears on his court-ordered child support obligations, a factor we cited in upholding a similar special condition in United States v. Camp, 410 F.3d 1042, 1046 (8th Cir. 2005). Although we have some doubt about this special condition, Deatherage fails to show specific hardship or adverse effect, and the condition is limited to monitoring his financial affairs rather than prohibiting specific business or financial activities. Based on the rigorous nature of plain error review, and the district court's abundant opportunity to amend or ameliorate any unreasonable adverse impact during the term of Deatherage's supervised release, we conclude that, even if Special Condition 8 was not based on an individualized inquiry, there was no plain error.

For the foregoing reasons, the judgment of the district court is affirmed.

BYE, Circuit Judge, concurring in the result.

Because our review is for plain error and because our precedent dictates that we search the record in an attempt to discern the reasons for the imposed conditions, I reluctantly concur in the result reached by the majority.

I also do write separately, however, to express my deep concern for our circuit's rapid erosion of appellate review of special conditions of supervised release. Our precedent is clear: "When crafting a special condition of supervised release, the district court *must* make individualized inquiry into the facts and circumstances underlying a case and make sufficient findings on the record so as to ensure that the special condition satisfies the statutory requirements." United States v. Forde, 664 F.3d 1219, 1222 (8th Cir. 2012) (internal quotation marks and citation omitted) (emphasis added). We continue to cite this language in our opinions discussing the imposition of special conditions. We continue to emphasize district courts must be

careful to "conduct an inquiry on an individualized basis" and "not impose special conditions categorically on all individuals convicted of certain offenses." United States v. Morais, 670 F.3d 889, 895 (8th Cir. 2012). Yet, we have effectively begun eroding this requirement by suggesting that "'[a]t some point, there must be a limit to the need for an individualized inquiry, because certain characteristics may justify corresponding conditions for virtually *all* offenders with such characteristics.'" Ante at 3 (quoting United States v. Springston, 650 F.3d 1153, 1156 (8th Cir. 2011) (vacated on other grounds) (emphasis added)). I cannot reconcile this newly suggested approach with the clearly established law of our circuit as to special conditions having to be based on the "nature and circumstances of the [particular] offense and the history and characteristics of the [individual] defendant." United States v. Bender, 566 F.3d 748, 752 (8th Cir. 2009) (internal quotation marks and citation omitted). Thus, unless and until our en banc court decides otherwise, our circuit's precedent requires district courts to make an inquiry based on an individual basis and prohibits them from imposing "a special condition on all those found guilty of a particular offense." United States v. Davis, 452 F.3d 991, 995 (8th Cir. 2006).

We also continue to emphasize that district courts must "make sufficient findings on the record so as to ensure that the special condition satisfies the statutory requirements." Forde, 664 F.3d at 1222 (internal quotation marks and citation omitted). Yet, we willingly parse through extensive records, as we did in this case, engaging in unassisted searches of evidence to find some support—any support—for the imposed conditions and forgetting it is the district court's responsibility in the first instance to provide us with the reasons behind its decision. See, e.g., United States v. Schaefer, 675 F.3d 1122, 1124 (8th Cir. 2012) ("While this court encourages detailed findings, it is enough that the basis for the imposed condition can be discerned from the record."); United States v. Thompson, 653 F.3d 688, 694 (8th Cir. 2011) (holding a special condition need not be vacated "if the basis for the imposed condition can be discerned from the record"). We call these unassisted searches a "harmless error" review. But at some point, we must also remember we are not ferrets

-16-

obligated to sift through voluminous records in search of *some* evidence which might support the imposed conditions. We must also remember that the responsibility to make sufficient findings on the record lies with the district courts, not our court. We must remember there is a difference between reasons which are easily discerned from the record, see, e.g., United States v. Carlson, 406 F.3d 529, 532 (8th Cir. 2005) (upholding a special condition in the absence of detailed findings because the record clearly "justified, if indeed not compelled" the imposed condition), and reasons we speculate to be the basis for the imposed conditions only after we have extensively searched for them in, or even outside, the record, see, e.g., United States v. Mosley, 672 F.3d 586, 591-92 (8th Cir. 2012) (looking to the Physician's Desk Reference to explain the possible effect of alcohol on individuals taking certain medications and to support, in part, the district court's decision to impose a special condition banning the use of any alcohol).

Because I fear our review of special conditions of supervised release is headed in the wrong direction, I urge us not to forget our precedent still requires "a particularized showing of the need for the [special] condition in each case." United States v. Kelly, 625 F.3d 516, 520 (8th Cir. 2010). We must, therefore, not allow the categorical imposition of special conditions "on all those found guilty of a particular offense," Davis, 452 F.3d at 995, and hold district courts accountable for the failure to show they engaged in an individualized inquiry by making sufficient findings on the record.

I therefore reluctantly concur in the result.

_____